## Preliminary Expert Report of Seth W. Stoughton

I was retained by counsel for the plaintiff to review the interaction between Bluffton Police Department officers and Ted Ellis. This preliminary report is based on the materials reviewed to date. I understand that additional materials are likely to be available in the future. Should any additional information cause me to expand, add, or revise any of my opinions, I reserve the right to revise, amend, or supplement this report accordingly.

---

## Table of Contents

Table of Contents ........................................................................................................................... 1

Background and Qualifications ...................................................................................................... 2

Compensation ................................................................................................................................ 5

Methodology .................................................................................................................................. 5

Understanding of Facts .................................................................................................................. 6

1. Framework for Factual Analysis ............................................................................................ 6

    A. Constitutional Framework ............................................................................................... 6

    B. State Law Framework ...................................................................................................... 7

2. Summary of Relevant Facts ................................................................................................... 7

Opinions ...................................................................................................................................... 19

The justifications for my opinions are laid out below. ................................................................ 19

1. Any reasonable officer would have known that, under the circumstances, Ofc. Kirkman's use of force was unreasonable, excessive, and contrary to generally accepted police practices. ................................................................... 19

    A. Ambiguity in the available evidence prevents me from rendering an opinion about whether a reasonable officer on the scene would believe that force was reasonable under the circumstances ....................................... 19

    B. Any reasonable officer would have known that a rear double leg takedown on a handcuffed subject was unreasonable, excessive, and contrary to generally accepted police practices ........................................... 22

2. Ofc. Kirkman's descriptions of certain events are inconsistent with the video evidence ................................................................................................................................ 28

Submission .................................................................................................................................. 29

**Background and Qualifications**

My opinions are based, in part, on my training, professional experience, education, and academic research. My background and qualifications are set forth in the curriculum vitae attached to this report. I highlight and supplement that material here with information relevant to my review and evaluation in this case.

I served as an officer in the Tallahassee Police Department in Tallahassee, Florida. The city of Tallahassee is located in northern Florida; it encompasses over 90 square miles and has a city population of over 180,000 and a metropolitan-area population of over 375,000. The Tallahassee Police Department employs over 350 sworn officers.

I was employed as an officer for a total of five and a half years. I served as a full-time officer from March 2001 until October 2005, and a reserve (part-time) officer from November 2005 until June 2006. As a full-time officer, I earned and maintained multiple operator and instructor certifications beyond my state certification as a police officer. During the course of my service with the department, I was assigned to the Uniform Patrol Division. I also had a wide range of duties beyond my standard duty assignment. Those duties included serving as a Special Response Team member, teaching report writing to other officers, establishing and teaching community self-defense courses, and serving as an acting supervisor as needed. As an officer, I conducted or participated in hundreds of stops and arrests and used force on a number of occasions.

Supplementing my training and experience as an officer, I have received additional training and exposure to the use of force through as a professional martial arts instructor. I was active as a martial arts instructor from 1999 until 2008, and I have remained active in martial arts training since.

I also served as an investigator in the Florida Department of Education's Office of Inspector General. The Florida Department of Education has state-wide authority related to education, including providing technical assistance and support to 67 local school districts, the Florida School for the Deaf and the Blind, and 28 state and community colleges; the management of statewide education funding and teacher certifications; the administration of private school tuition voucher programs; and the operation of Florida's Division of Blind Services and Division of Vocational Rehabilitation. The Florida Department of Education has more than 2,500 employees and has an annual budget of more than $20 billion, roughly a quarter of Florida's total budgetary expenditures. The Office of Inspector General is responsible for, *inter alia*, conducting and coordinating investigations into allegations of waste, fraud, abuse, and financial mismanagement within or related to the Florida Department of Education.

I was employed as an investigator for more than two and half years, serving from November 2005 until July 2008. In that time, I earned and maintained several professional certifications related to investigations (e.g., Certified Inspector General Investigator). As an investigator, I conducted

investigations into a wide variety of alleged criminal and administrative violations, including leading several multi-agency criminal investigations. I was assigned to handle several particularly complicated investigations, including a whistleblower allegation that the state had improperly garnished millions of dollars in wages from hundreds of individuals who had defaulted on their student loans. My investigations regularly and frequently required me to conduct interviews or interrogations. In 2007, I was recognized with a Meritorious Performance Award for the quality of my investigations. In 2008, I was given a statewide commendation for the number of my fraud investigations that led to arrest and prosecution. Beyond my investigative duties, I trained new investigators, drafted investigative policy, and reviewed investigative reports.

In addition to specialized knowledge developed as an officer and investigator, I have conducted academic research on policing for more than seven years. I am a tenured member of the faculty of the University of South Carolina School of Law, where I teach in the area of criminal law and procedure. My research focuses on the regulation of policing, including the use of force, investigative procedure, agency policies, and industry practices. My previous academic appointment was a two-year teaching fellowship at Harvard Law School, where I researched the same topics.

I have published extensively on policing, including on police tactics and the use of force. I am the principal author of *Evaluating Police Uses of Force*, a book that is scheduled for publication by New York University Press in 2020. My academic articles have been published in the *Harvard Law Review Forum*, the *Minnesota Law Review*, the *North Carolina Law Review*, the *Tulane Law Review*, the *Virginia Law Review*, the *Wake Forest Law Review*, and other leading journals. I have published or am publishing book chapters in *Evidence Based Policing: An Introduction*; in *Legal Issues Around the Globe* (Vol. I); and in *Critical Issues in Policing* (8th ed.).

My work is widely relied upon in the field. Electronic versions of my work have been downloaded thousands of times, and my work has been broadly cited by legal scholars in top journals including the *Yale Law Journal*, the *Harvard Law Review*, the *California Law Review*, the *Duke Law Journal*, the *Columbia Law Review*, the *N.Y.U. Law Review*, the *Georgetown Law Journal*, and the *Cornell Law Review*, just to name a few. My work has also been cited by scholars in other disciplines, most prominently in criminology (e.g., in *Criminology & Public Policy*, *Police Quarterly*, and *Journal of Research in Crime and Delinquency*) but also in geography (e.g., in *Political Geography*) and psychology (e.g., in *Psychonomic Bulletin & Review*). It has also been cited in textbooks, casebooks, treatises (e.g., in Wayne LaFave's *A Treatise on the Fourth Amendment*), and both popular and books academic texts (including in James Forman, Jr.'s *Locking Up Our Own*, Barry Friedman's *Unwarranted: Policing Without Permission*, Stephen Rushin's *Federal Intervention in American Police Departments*, Chris Hayes' *A Colony in a Nation*, and Norm Stamper's *To Protect and Serve*). Further, my academic research has been featured in national and international media, including in *The New York Times*, on National Public Radio, and a host of other publications.

I have also filed or joined multiple briefs amicus curiae to the Supreme Court of the United States related to police procedure, including the use of force. Additionally, I have written about policing for *The New York Times*, *The Atlantic*, *TIME*, and other media publications, and I have appeared on domestic and international print, radio, and television media as a policing expert on more than four hundred occasions.

I serve as an Adviser to the American Law Institute, *Principles of the Law, Policing*. I have also served as a subject matter expert for CNA Analysis & Solutions, which received a Bureau of Justice Assistance grant to develop technical assistance related to police body-worn cameras; in that capacity, I provided verbal and written consultation, as well as presented, by invitation, a keynote address on using police body-worn cameras to investigate and evaluate officer actions. I provided subject matter expertise to the OIR Group in its review of the Madison Police Department, and I have conducted multiple trainings for investigators, supervisors, and lawyers employed by the City of Chicago's Civilian Office of Police Accountability, all of which related to investigating police uses of force.

I am regularly invited to speak about various aspects of policing to legal, law enforcement, and academic audiences. To date, I have formally presented on policing issues by invitation more than 100 times to audiences that include the Fourth Circuit Judicial Conference; the American Judges Association; the Conference of Chief Justices; the National Conference of State Courts; state judicial conferences in Indiana, Kansas, Missouri, North Dakota, Ohio, South Carolina, and Tennessee; the Federal Law Enforcement Training Center; federal Inspectors General & Inspectors General Investigators; the Senior Executive Staff of the Bureau of Alcohol, Tobacco, Firearms, and Explosives; the National Association of Women Law Enforcement Executives; the Peace Officers' Association of Georgia; the South Carolina Police Chiefs Association; the Command Staff of the Kansas City (Missouri) Police Department; and the Washington State Criminal Justice Training Commission, among others.

I also provide subject matter expertise to police agencies and consultants and to legislators working on police-related legislation, and I am regularly retained to provide expert review and testimony related to police litigation. I have been retained and qualified as an expert witness in state and federal court and in the course of both civil and criminal litigation. A complete list of cases in which I have provided testimony or written reports is provided in the attached curriculum vitae.

I currently serve on the Citizen Advisory Council of the Columbia Police Department in Columbia, South Carolina, a department of approximately 350 sworn officers serving a city with a population of over 130,000 and a metropolitan-area population of over 800,000. I am one of the original members of the council, having served in that capacity since 2015.

## Compensation

My fee for analysis in this case is $320 per hour, billed in 0.25-hour increments. On days when I am expected to testify, I bill at a minimum rate of eight (8) hours.

## Methodology

To ensure my methodology was reliable, I did not assign credibility to any witness or source of information prior to a review of provided materials, I developed my understanding of relevant facts only after reviewing the provided materials, and I assumed those facts to be true solely for the purpose of analysis. In sum, I reviewed sufficient information to reach conclusions to a reasonable degree of professional certainty. I then analyzed those facts against a backdrop of the professional standards for police officers and the protocols for traffic stops, seizures, arrests, tactics, use-of-force incidents, and other practices, principles and protocols recognized, relied upon, and employed in the law enforcement profession on the date of this incident. The methodology is consistent with the methodology utilized by other experts in the field when analyzing incidents of this type.

I was provided with and reviewed the following materials:

- Bluffton Police Department
  - Officer Report for Incident 17BP28602
  - Internal Affairs No: UF 2017-004
  - Use of Force Report
  - Media Chain of Custody Report
  - Multimedia
    - 057742_170803_161349_0_f.mp4
    - 057748_170803_162020_4_f.mp4
    - 062651_170803_163654_0_f.mp4
    - Copy of Kirkman.Arrest.avi
    - Copy of Kirkman.Hospital.avi
    - Copy of Swinehamer.Arrest.avi
- Litigation Documents
  - Complaint, Aug. 2, 2019
  - Summons, Aug. 2, 2019
- Medical Documents
  - Coastal Carolina Medical Center, Aug. 4, 2017
  - Coastal Carolina Medical Center, Aug. 5, 2017
  - Howard Family Dental, Statement, Dec. 12, 2017
- Other materials not specifically identified

## Understanding of Facts

I was asked to review and provide opinions relating to the interaction that led to the use of force by Bluffton Police Department Officer Cody Kirkman against Ted Ellis. In the following subsections, I first set out the framework for factual analysis in this case. I then synopsize my understanding of the relevant facts and circumstances.

### 1. Framework for Factual Analysis

In this section, I set out the relevant frameworks for factual analysis for both constitutional analysis and state law analysis.

#### A. Constitutional Framework

The use of force implicates the constitutional right to be free of unreasonable seizures.[1] The constitutional standard for seizures, including the use of force, is laid out in the Supreme Court's Fourth Amendment jurisprudence, which holds that seizures must be objectively reasonable.

The "objective reasonableness" standard for evaluating use of force incidents under the Fourth Amendment was laid out by the Supreme Court in *Graham v. Conner*.[2] In *Graham*, the Court held that the determination of whether a particular seizure was constitutionally reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."[3] That balancing test demands "careful attention to the facts and circumstances of each particular case."[4] Specifically, "[T]he question is whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting [the officer], without regard to their underlying intent or motivation."[5]

In *Graham v. Connor*, the Court provided guidance as to which facts and circumstances are relevant to the objective reasonableness determination, stating:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in

---

[1] First Amended Complaint and Demand for Jury Trial, Oct. 5, 2018

[2] 490 U.S. 386 (1989).

[3] *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted).

[4] *Graham v. Connor*, 490 U.S. 386, 396 (1989).

[5] *Graham v. Connor*, 490 U.S. 386, 397 (1989).

circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.[6]

Thus, the operative facts and circumstances for assessing an officer's use of force under the Fourth Amendment framework requires reviewing the facts and circumstances as they would have appeared to a reasonable officer on the scene, subject to the perceptual and cognitive stresses of the situation. Information that a reasonable officer on the scene would have *not* been aware of at the time, including information discovered after the use of force, is relevant only to the limited extent that it can help assess the reasonableness of the officer's perceptions and conclusions prior to and during the use of force.[7]

### B. State Law Framework

The use of force implicates state law regulating police actions. In South Carolina, police uses of force are regulated primarily by common law. The state Supreme Court has held, "When an officer has a right to make an arrest, he may use whatever force is reasonably necessary to apprehend the offender or effect the arrest."[8]

I understand the "reasonably necessary" language to mirror, in effect, the constitutional standard: whether an officer's actions were reasonably necessary must be determined from the perspective of the hypothetical "reasonable officer" on the scene.

## 2. Summary of Relevant Facts

On August 3, 2017, Bluffton Police Department Officer Cody Kirkman's automated license plate reader had alerted him that a nearby vehicle's registration was suspended for cancellation of insurance, effective July 31, 2017.[9] He initiated a traffic stop of that vehicle, which was driven by Ted Ellis.[10] The traffic stop was recorded by Ofc. Kirkman's in-car camera[11] and body-worn

---

[6] *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

[7] For example, the reasonableness of an officer's perception that a subject was reaching for a weapon in their waistband will tend to be corroborated if it is later determined that the subject had a weapon in their waistband. In the same vein, the reasonableness of an officer's perception that a subject was reaching for a weapon in their waistband may be undermined if it is later determined that the subject did not have anything in their waistband at the time. Critically, the later findings are not dipositive: a subject might reach for their waistband even without a weapon there, and a subject who does have a weapon in their waistband might not reach for it. Nevertheless, in this narrow context, information that would not have been available to the reasonable officer at the time can be relevant to the evaluation of the officer's perspective and conclusions.

[8] State v. Weaver, 265 S.C. 130, 136 (1975); see also State v. DeBerry, 250 S.C. 314, 320 (1967); State v. Williams, 367 S.C. 192, 198 (Ct. App. 2005).

[9] Bluffton Police Department, Officer Report for Incident 17BP28602, at 3.

[10] Bluffton Police Department, Officer Report for Incident 17BP28602, at 3.

[11] It is unclear whether Ofc. Kirkman lacked a microphone or if his microphone was not activated; the audio is limited to that picked up by the base unit in the vehicle. 057742_170803_161349_0_f.mp4

camera (BWC),[12] and by Ofc. Amber Swinehammer's in-car camera[13] and BWC.[14] For this report, I synchronized the footage from those four sources into a single video.

According to Ofc. Kirkman's report, Mr. Ellis "became agitated" when he learned the reason for the stop.[15] The video footage from Ofc. Kirkman's BWC reflects that while Mr. Ellis appears surprised by the suspension, he did not appear to express agitation toward the officer.[16] A synchronized version of the relevant video footage (roughly the first two minutes of the traffic stop, from Ofc. Kirkman's initial approach until Ofc. Kirkman walked back to his own car) is embedded for reference and can be viewed by clicking the image below (the video will play in the document).[17]

Initial Contact Video

Mr. Ellis provided the vehicle registration when requested but stated that he did not have his license on him.[18] Ofc. Kirkman obtained the information required to check Mr. Ellis's license

---

[12] Copy of Kirkman.Arrest.avi.
[13] 057748_170803_162020_4_f.mp4.
[14] Copy of Swinehammer.Arrest.avi.
[15] Bluffton Police Department, Officer Report for Incident 17BP28602, at 3.
[16] Copy of Kirkman.Arrest.avi.
[17] Adobe Flash is required to view the video. It may be downloaded for installing from the following link: https://helpx.adobe.com/acrobat/11/using/flash-player-needed-acrobat-reader.html.
[18] Bluffton Police Department, Officer Report for Incident 17BP28602, at 3; Copy of Kirkman.Arrest.avi at 0:00:26

with the Department of Motor Vehicle, then returned to his patrol vehicle.[19] Almost three minutes later, Ofc. Kirkman returned to Mr. Ellis's vehicle and inquired about his car insurance.[20] According to Ofc. Kirkman's report, Mr. Ellis "became increasingly agitated" and "began yelling and swearing," opening the glove box "with enough force to break it."[21] Ofc. Kirkman's report fails to mention that Mr. Ellis appears to have been on the phone at the time – when he returns to Mr. Ellis's vehicle, Mr. Ellis is in the middle of a sentence (denying that he had been speeding).[22] Mr. Ellis's expressions of irritation appear to be part of his phone conversation rather than being directed at Ofc. Kirkman, although he did tell Ofc. Kirkman that he was "pissed off right now."[23] Mr. Ellis provided the requested insurance information.[24]

The DMV check determined that Mr. Ellis's license had been suspended indefinitely and that he had a 2014 conviction for driving with a suspended license.[25] According to Ofc. Kirkman's report, he decided to take Mr. Ellis into custody and radioed for additional officers to assist.[26] Ofc. Amber Swinehammer and Ofc. Lindsey Gibson responded.

Once another officer had arrived,[27] Ofc. Kirkman told Mr. Ellis to turn off his vehicle, which he did.[28] Ofc. Kirkman told Mr. Ellis to get out of his vehicle, which he did "while continuing to voice his disapproval of the situation."[29]

Ofc. Kirkman had Mr. Ellis face his vehicle and handcuffed him.[30] Ofc. Kirkman's report states that Mr. Ellis "continued to get increasingly angry."[31] Ofc. Swinehammer's report states that Mr. Ellis "began to pull away from [Ofc. Kirkman] a bit" while being handcuffed.[32] Mr. Ellis moved while being secured and verbally expressed irritation.[33] When Ofc. Kirkman told Mr. Ellis

[19] Bluffton Police Department, Officer Report for Incident 17BP28602, at 3.

[20] Copy of Kirkman.Arrest.avi at 0:04:54.

[21] Bluffton Police Department, Officer Report for Incident 17BP28602, at 3.
Note that Ofc. Kirkman's report was written in all capital letters. For readability, quotations from Ofc. Kirkman's report have been converted into standard capitalization.

[22] Copy of Kirkman.Arrest.avi at 0:05:01.

[23] Copy of Kirkman.Arrest.avi at 0:05:16.

[24] Bluffton Police Department, Officer Report for Incident 17BP28602, at 3.

[25] Bluffton Police Department, Officer Report for Incident 17BP28602, at 3.

[26] Bluffton Police Department, Officer Report for Incident 17BP28602, at 3.

[27] The reports are inconsistent as to which officers were actually on scene at the time Mr. Ellis was handcuffed. According to Ofc. Kirkland's report, Ofc. Gibson and Ofc. A. Swinehammer responded and arrived on scene prior to effecting the custodial arrest. Bluffton Police Department, Officer Report for Incident 17BP28602, at 3. According to Ofc. Swinehammer's report, Mr. Ellis was handcuffed prior to Ofc. Gibson arriving on scene. Bluffton Police Department, Officer Report for Incident 17BP28602, at 6. According to Ofc. Gibon's report, she arrived as Ofc. Kirkman handcuffed Mr. Ellis. Bluffton Police Department, Officer Report for Incident 17BP28602, at 7.

[28] Bluffton Police Department, Officer Report for Incident 17BP28602, at 3.

[29] Bluffton Police Department, Officer Report for Incident 17BP28602, at 3.

[30] Bluffton Police Department, Officer Report for Incident 17BP28602, at 3-4.

[31] Bluffton Police Department, Officer Report for Incident 17BP28602, at 4.

[32] Bluffton Police Department, Officer Report for Incident 17BP28602, at 6.

[33] Copy of Kirkman.Arrest.avi at 0:07:26.

to stop moving and physically pushed him toward the vehicle, Mr, Ellis said, "You got me in handcuffs doing that. I'll beat your pussy ass if I wasn't in no fucking handcuffs."[34]

There is an inconsistency in the facts with regard to subsequent events. According to Ofc. Kirkman's report, he "began to conduct a search of Ellis' person"[35]; he "began to check Ellis' [*sic*] pockets," but Mr. Ellis "attempted to turn around in an effort to stop the search" and told Ofc. Kirkman to put him in the police vehicle.[36]

The video evidence appears to contradict Ofc. Kirkman's statement that he attempted to search Mr. Ellis at the time. The video from Ofc. Kirkman's and Ofc. Swinehammer's BWCs shows Ofc. Kirkman handcuffing Mr. Ellis and starting to double-lock Mr. Ellis's handcuffs. Mr. Ellis moved, and Ofc. Kirkland directed him to stop moving, but it was not while Ofc. Kirkman was attempting to conduct a search and thus could not have been "in an effort to stop the search."[37] A synchronized version of the relevant video footage (from Mr. Ellis being handcuffed until Ofc. Kirkman relocates him to a position next to a police vehicle) is embedded for reference and can be viewed by clicking the image below (the video will play in the document).[38]

Handcuffing Video

---

[34] Copy of Kirkman.Arrest.avi at 0:08:10.
[35] Bluffton Police Department, Officer Report for Incident 17BP28602, at 4.
[36] Bluffton Police Department, Officer Report for Incident 17BP28602, at 4.
[37] Copy of Swinehammer.Arrest.avi at 0:05:01.
[38] Adobe Flash is required to view the video. It may be downloaded for installing from the following link: https://helpx.adobe.com/acrobat/11/using/flash-player-needed-acrobat-reader.html.

Ofc. Kirkman then relocated Mr. Ellis to a position on the passenger side of his patrol car (nearest traffic) to conduct a search incident to arrest.[39] According to Ofc. Kirkman's report, Mr. Ellis told Ofc. Kirkman that he did not need to be searched and attempted to turn toward Ofc. Kirkman several times.[40] As Ofc. Kirkman wrote:

> Ellis would turn towards me which prevented me from conducting the search. I gave Ellis several commands to allow me to search him and I would use my left arm to turn him back around. Ellis remained verbally and physically resistant to the search by turning towards me while I was searching and saying to "just put him in the vehicle."[41]

According to Ofc. Swinehammer's report:

> Officer Kirkman told Ellis serval times to stop moving and let him continue the search. Ellis began to push back and turn to the side while he [presumably Ofc. Kirkman] was attempting to complete the task. Officer Kirkman again told him to comply and Ellis continued to push back into Officer Kirkman.[42]

According to Ofc. Gibson's report, "Ellis continued to turn and push back towards Officer Kirkman in an irritate [sic] manner. Officer Kirkman continued to tell Ellis to stop moving so he could continue his search however Ellis was not complying . . . ."[43]

The videos reflect that, after relocating Mr. Ellis, Ofc. Kirkman pushed him against the back of the police vehicle and told him to "stop" several times.[44] Ofc. Kirkman then began searching Mr. Ellis's pockets, and Mr. Ellis continued to talk.[45] After searching Mr. Ellis's pockets, Ofc. Kirkman moved him back away from the police vehicle, presumably to continue to search.[46] As Ofc. Kirkman reached his left hand to the area of Mr. Ellis's left waist, Mr. Ellis turned to his left slightly, turning toward where Ofc. Kirkland was reaching.[47] The videos suggest that Ofc. Kirkman then pushed Mr. Ellis back toward the police vehicle, saying, "If you don't stop moving, I'll put you on the ground."[48] Ofc. Kirkman and Mr. Ellis then had a verbal exchange in which Ofc. Kirkman told Mr. Ellis to stop moving (Mr. Ellis did not appear to be moving at the time, but was looking over his left shoulder in Ofc. Kirkman's direction) and Mr. Ellis telling

---

[39] Bluffton Police Department, Officer Report for Incident 17BP28602, at 4, 6, 7.
[40] Bluffton Police Department, Officer Report for Incident 17BP28602, at 4.
[41] Bluffton Police Department, Officer Report for Incident 17BP28602, at 4.
[42] Bluffton Police Department, Officer Report for Incident 17BP28602, at 6.
[43] Bluffton Police Department, Officer Report for Incident 17BP28602, at 7.
[44] Readers are referred to the embedded video on the following page.
[45] Readers are referred to the embedded video on the following page.
[46] Readers are referred to the embedded video on the following page.
[47] Readers are referred to the embedded video on the following page.
[48] Readers are referred to the embedded video on the following page.

Ofc. Kirkman that he did not have anything on him and to put him in the car.[49]

Ofc, Kirkman, who was standing behind Mr. Ellis and apparently pressing him into the police vehicle, reached down, grabbed Mr. Ellis's lower body, and lifted up and back while he turned slightly to his left.[50] There is an inconsistency in how Ofc. Kirkman's actions are reflected in the record. Ofc. Kirkman's report states that he "reached from Ellis' [sic] around the waist."[51] Ofc. Swinehammer's report states that Ofc. Kirkman "reached down and grabbed Ellis by both ankles, moving both of Ellis' feet out from underneath him."[52] Ofc. Gibson's report states that Ofc. Kirkman "bent down, wrapped his arms around Ellis's legs, moving both of Ellis' feet out from underneath him."[53] A use of force report completed by Master Patrolmen Jeff Dickson described "Officer Kirkman lowering himself, grabbing [redacted, presumably Mr. Ellis] just below his knees, pulling them from under him which forced [redacted, presumably Mr. Ellis] to the ground."[54] The video shows that Ofc. Kirkman did not grab Mr. Ellis around the waist, as he claimed in his report, but rather below the knees.

This space intentionally left blank.

---

[49] Readers are referred to the embedded video on the following page.
[50] Readers are referred to the embedded video on this page.
[51] Bluffton Police Department, Officer Report for Incident 17BP28602, at 4.
[52] Bluffton Police Department, Officer Report for Incident 17BP28602, at 6.
[53] Bluffton Police Department, Officer Report for Incident 17BP28602, at 7.
[54] Bluffton Police Department, Use of Force Report, at 2.

As a result of having his legs moved out from beneath him, Mr. Ellis fell forward. He was unable to catch himself or mitigate the fall with his hands, which were handcuffed behind his back. Mr. Ellis's face struck the ground.[55] A synchronized version of the relevant video footage (from the time Ofc. Kirkman brings Mr. Ellis to a position next to the police vehicle until the use of force) is embedded for reference and can be viewed by clicking the image below (the video will play in the document).[56]

Search and Takedown Video.

Additionally, screen captures from the synchronized videos are provided for reference on the following pages. The images from have been limited to Ofc. Swinehammer's in-car camera and BWC and are cropped for visibility.

This space intentionally left blank.

---

[55] Bluffton Police Department, Officer Report for Incident 17BP28602, at 4, 6.
[56] Adobe Flash is required to view the video. It may be downloaded for installing from the following link: https://helpx.adobe.com/acrobat/11/using/flash-player-needed-acrobat-reader.html.

Ofc. Kirkman pushed Mr. Ellis against the police vehicle.



Ofc. Kirkman then bent and reached for Mr. Ellis's legs.



Ofc. Kirkman grabbed both of Mr. Ellis's legs below the knee.



Ofc. Kirkman lifted, pulled back with his hands, and turned slightly to his left, pushing his right shoulder into Mr. Ellis and lifting Mr. Ellis into the air.

 

Ofc. Kirkman pulled Mr. Ellis's legs up and back as Mr. Ellis's torso fell forward.



Mr. Ellis fell forward, completely uncontrolled. At one point he was roughly parallel to the ground at a height that appears to have been at or above the top of the nearest tire on Ofc. Kirkman's vehicle.



When Mr. Ellis struck the ground, Ofc. Kirkman was still holding his legs up.



There is a discrepancy with regard to the nature of the injuries that Mr. Ellis suffered. According to Ofc. Kirkman's report, Mr. Ellis suffered "a laceration on his chin"[57] which received "a small amount of stitches,"[58] and a Coastal Carolina doctor stated that there was no other injury.[59] The Bluffton Police Department Internal Affairs report referred to the injury as "a small laceration."[60] A use of force report stated that Mr. Ellis suffered "minor injuries to his jaw."[61] Documental from Coastal Carolina Medical Center on Aug. 3, 2017, indicate that Mr. Ellis was diagnosed with a "[c]hin laceration, a "[c]losed fracture of mandible with delayed healing," (a [l]eft mandibular bicuspid base hairline fracture), and a "[h]ead injury, closed, with brief [loss of consciousness]," along with a loose left bicuspid lower tooth.[62] Later medical documentation, reflects that Mr. Ellis was diagnosed with a concussion and post concussion syndrome, cervical sprain, and dental injuries.[63]

A later Internal Affairs investigative report documents that Ofc. Swinehammer and Ofc. Gibson

[57] Bluffton Police Department, Officer Report for Incident 17BP28602, at 4.
[58] Bluffton Police Department, Officer Report for Incident 17BP28602, at 5.
[59] Bluffton Police Department, Officer Report for Incident 17BP28602, at 5.
[60] Bluffton Police Department, IA No: UF 2017-004, at 2.
[61] Bluffton Police Department, Use of Force Report, at 1.
[62] Coastal Carolina Medical Center, Aug. 3, 2017
[63] Howard Family Dental, Statement, Dec. 12, 2017; Coastal Carolina Medical Center, Aug. 5, 2017

were given "Counseling reports" for failing "to assist Officer Kirkman when he was attempting to make an arrest."[64]

Ofc. Dickson's use of force report concluded that Ofc. Kirkman's use of force was reasonable, but that "Officer Kirkman, Officer Swinehammer, and Officer Gibson did not prevent [redacted, but presumably Mr. Ellis] from hurting himself."[65]

This space intentionally left blank.

---

[64] Bluffton Police Department, IA No: UF 2017-004, at 2.
[65] Bluffton Police Department, Use of Force Report, at 3.

**Opinions**

I hold the opinions below to a reasonable degree of professional certainty. The basis and reasons for my opinions are premised upon my education, training, and experience in law enforcement; my knowledge and research as a policing scholar; my knowledge of law enforcement standards, analysis, and study; my familiarity with generally accepted police practices and the professional and academic literature in the field; and my understanding of the facts of this case based upon a comprehensive review of the materials listed above. Where the facts are in dispute or I have otherwise relied upon assumptions or hypotheticals, my opinions are conditioned on those assumptions or hypotheticals.

My opinions in this case are as follows:

1. Any reasonable officer would have known that, under the circumstances, Ofc. Kirkman's use of force was unreasonable, excessive, and contrary to generally accepted police practices

2. Ofc. Kirkman's descriptions of certain events are inconsistent with the video evidence

The justifications for my opinions are laid out below.

## 1. Any reasonable officer would have known that, under the circumstances, Ofc. Kirkman's use of force was unreasonable, excessive, and contrary to generally accepted police practices.

Officers are empowered to use force in the course of their duties when appropriate. The use of force is governed by legal rules (e.g., constitutional and state law), administrative regulations (e.g., agency policies), and professional norms (e.g., generally accepted police practices). As a practical matter, the framework for analyzing the use of force under any of the substantive standards has two components relevant to the case at hand: First, did the situation justify the use of *some amount* of force? Second, if so, did the situation justify the *type and amount* of force actually used? I discuss each point in turn.

### A. Ambiguity in the available evidence prevents me from rendering an opinion about whether a reasonable officer on the scene would believe that force was reasonable under the circumstances

It is well recognized within policing that officers can use force only to address imminent threats to certain government interests, including officer safety and the apprehension of criminal suspects. An imminent threat exists (or reasonably appears to exist) when the subject has (or reasonably

appears to have) the ability, opportunity, and apparent intent to cause a particular type of harm.[66] In this context, "harm" is not limited to physical injury; it also includes, for example, evading apprehension. "Ability" refers to the subject's capacity to cause the identified harm through some explicitly identified means or mechanism. For example, an individual armed with a tire iron has the ability to strike someone in a way that can cause serious injuries or death, while an individual without a tire iron does not. "Opportunity" refers to the subject's proximity to the potential target in light of the specific harm at issue. For example, an individual with a tire iron who is physically close to an officer has the opportunity to strike them with it, while an individual with a knife who is fifty feet away does not. "Apparent intent" refers to the subject's perceived mental state, their apparent desire to cause the identified harm. For example, an individual with a tire iron who is physical close to an officer and who is preparing to swing it at the officer has the apparent intention to injure or kill the officer, while an individual who is using a tire iron to change a tire while speaking with an officer standing nearby does not.

> Importantly, intent may be properly articulated through a combination of multiple factors even if no individual factor is sufficient on its own. [M]erely holding a tire iron is not in and of itself indicative of the intent to cause harm. Nor is walking toward an officer. Nor is failing to obey an officer's commands. However, walking toward an officer while holding a tire iron and ignoring the officer's commands to stop or drop the weapon can be, in combination, indicative of the individual's intent.[67]

Officers need not wait until a threat has fully manifested into an attack, of course. To continue the example in the previous paragraph, an officer need not wait until the approaching individual actually swings the tire iron before using force. In the same vein, officers need not wait until someone starts running and is about to get away before using force to restrain them; so long as the individual has the ability, opportunity, and apparent intention to evade capture, they present an imminent threat to the government's interest in apprehending suspected wrongdoers.

In this case, the relevant government interest is in searching Mr. Ellis incident to his arrest. Searches incident to arrest are unquestionably important; concealed weapons can be used to hurt officers, bystanders, or the arrestee themselves, concealed means of escape can be used to frustrate the government's interest in apprehension, and concealed evidence can be destroyed or hidden.[68] For that reason, the authority of officers to search the person of arrestees has never seriously been

---

[66] See, e.g., INTERNATIONAL ASS'N OF CHIEFS OF POLICE, NATIONAL CONSENSUS POLICY & DISCUSSION PAPER ON USE OF FORCE at 11 (2017). Some sources refer to "imminent threats" instead of "immediate threats" There is no wide accepted agreement about how "imminent" and "immediate" are defined. For the purposes of this report, I use the terms "imminent" and "immediate" synonymously.

[67] SETH W. STOUGHTON ET AL., EVALUATING POLICE USES OF FORCE 35 (forthcoming 2020).

[68] See Chimel v. California, 395 U.S. 752, 764 (1969).

questioned.[69]

In this case, the available information is ambiguous with regard to whether Mr. Ellis presented a legitimate threat to Ofc. Kirkman's ability to conduct a search incident to arrest. According to Ofc. Kirkman's report:

> Ellis would turn towards me which prevented me from conducting the search. I gave Ellis several commands to allow me to search him and I would use my left arm to turn him back around. Ellis remained verbally and physically resistant to the search by turning towards me while I was searching and saying to "just put him in the vehicle."[70]

According to Ofc. Swinehammer's report:

> Officer Kirkman told Ellis serval times to stop moving and let him continue the search. Ellis began to push back and turn to the side while he [presumably Ofc. Kirkman] was attempting to complete the task. Officer Kirkman again told him to comply and Ellis continued to push back into Officer Kirkman.[71]

According to Ofc. Gibson's report, "Ellis continued to turn and push back towards Officer Kirkman in an irritate [*sic*] manner. Officer Kirkman continued to tell Ellis to stop moving so he could continue his search however Ellis was not complying . . . ."[72]

Video footage from Ofc. Kirkman's BWC, Ofc. Swinehammer's BWC, and Ofc. Swinehammer's in-car camera show that, after relocating Mr. Ellis, Ofc. Kirkman pushed him against the back of the police vehicle and told him to "stop" several times.[73] Ofc. Kirkman then began searching Mr. Ellis's pockets, and Mr. Ellis continued to talk.[74] After searching Mr. Ellis's pockets, Ofc. Kirkman moved him back away from the police vehicle, presumably to continue to search.[75] As Ofc. Kirkman reached his left hand to the area of Mr. Ellis's left waist, Mr. Ellis turned to his left slightly, turning toward where Ofc. Kirkland was reaching.[76] The videos suggest that Ofc. Kirkman then pushed Mr. Ellis back toward the police vehicle, saying, "If you don't stop moving, I'll put you on the ground."[77] Ofc. Kirkman and Mr. Ellis then had a verbal exchange in which Ofc. Kirkman told Mr. Ellis to stop moving (Mr. Ellis did not appear to be moving at the time, but was looking over his left shoulder in Ofc. Kirkman's direction) and Mr. Ellis telling

---

[69] See United States v. Robinson, 414 U.S. 218, 235 (1973).
[70] Bluffton Police Department, Officer Report for Incident 17BP28602, at 4.
[71] Bluffton Police Department, Officer Report for Incident 17BP28602, at 6.
[72] Bluffton Police Department, Officer Report for Incident 17BP28602, at 7.
[73] Readers are referred to the embedded video on the following page.
[74] Readers are referred to the embedded video on the following page.
[75] Readers are referred to the embedded video on the following page.
[76] Readers are referred to the embedded video on the following page.
[77] Readers are referred to the embedded video on the following page.

Ofc. Kirkman that he did not have anything on him and to put him in the car.[78]

While it is clear that Mr. Ellis was verbally resisting, the available information is ambiguous with regard to whether he was physically resisting or presented a legitimate threat to Ofc. Kirkman's ability to conduct a search incident to arrest. Specifically, Mr. Ellis does not appear to be resisting Ofc. Kirkman's actions in initially putting him against the police vehicle, backing him away, or pushing him back into the police vehicle. The most obvious movement on Mr. Ellis's part is after backing away, he turned slightly to his left, toward where Ofc. Kirkman was reaching, although he also appears to push back, to some extent, after being pushed against the vehicle for the second time.

It is important to keep in mind that while video footage reflects *visual* information, it cannot convey *tactile* information. That is to say, it is possible for Ofc. Kirkman to have been perceiving and reacting to pressures from Mr. Ellis's movement or attempted movement that are not clearly visible on camera.

If Mr. Ellis's physical movements did not present an imminent threat, as that term is properly defined, to Ofc. Kirkman's ability to conduct a search incident to arrest, the *any* use of force would be unreasonable, excessive, and contrary to generally accepted police practices. If, however, Mr. Ellis's physical movements did present an imminent threat to Ofc. Kirkman's ability to conduct a search incident to arrest, the use of some degree of physical force could be reasonable, appropriate, and consistent with generally accepted police practices. In that case, the next relevant question is whether Ofc. Kirkman's use of force was proportional to the threat presented.

### B. Any reasonable officer would have known that a rear double leg takedown on a handcuffed subject was unreasonable, excessive, and contrary to generally accepted police practices

Officers are taught that, pursuant to *Graham v. Connor*, 490 U.S. 386 (1989), any use of force must be objectively reasonable under the circumstances, which include what are popularly known by officers as the "*Graham* factors": the severity of the crime, whether the suspect presents an immediate threat to the safety of officers or others, and whether the suspect is attempting to evade arrest by flight. Officers learn that, pursuant to *Scott v. Harris*, 550 U.S. 372 (2007), the same rule applies to all types of force, both deadly force (that is, force likely to result in death or great bodily harm) and less-lethal force (that is, force that is unlikely to result in death or great bodily harm). They further learn that *Tennessee v. Garner*, 471 U.S. 1 (1985), helps define objective reasonableness in the context of deadly force: in that case, they learn, the Court held that deadly force was not reasonable when officers lacked probable cause to believe that the subject's actions

---

[78] Readers are referred to the embedded video on the following page.

presented a risk of death or great bodily harm to an officer or bystander.

Evaluating any use of force, then, requires the reviewer to first assess the force that officers used and then to determine whether that use was objectively reasonable. Officers are taught that the techniques and weapons they employ in use-of-force situations exist on a spectrum from the least severe force options to the most severe force options; the location of any given force option on the spectrum is dependent on the likely results of applying that technique or weapon. Critically, this classification requires reviewers to identify the *foreseeable* harms of the officer's actions, not (just) the actual harms that result from an officer's actions. Thus, shooting a firearm at a subject is properly considered a use of lethal force even if the bullet misses or only causes a superficial injury.

Put simply, the more serious the threat, the more severe the force options that officers may employ. In the deadly force context, for example, policing as an industry has adopted the approach laid out by the Supreme Court in *Tennessee v. Garner*, which holds that officers may use deadly force to address imminent threats of serious physical injury or death.[79] Thus, it is generally accepted within policing that officers can employ deadly force when they reasonably perceive an imminent threat, as that term is properly understood, of serious physical injury or death.

---

This space intentionally left blank.

---

[79] 471 U.S. 1, 3, 11 (1985).

In this case, Mr. Ellis was in handcuffs and standing with his torso against Ofc. Kirkman's vehicle. Ofc. Kirkman was behind Mr. Ellis pushing him forward toward the vehicle. Ofc. Kirkman, reached down, grabbed both of Mr. Ellis's legs, pushed his right shoulder forward into Mr. Ellis, lifted up and back, and turned slightly to his left.[80] As a result of having his legs moved out from beneath him, Mr. Ellis fell forward, striking his right shoulder against Ofc. Kirkman's vehicle as he fell in an uncontrolled manner. With his hands secured behind him, Mr. Ellis was unable to catch himself or mitigate the fall. Mr. Ellis's face struck the ground.[81] A synchronized version of the relevant video footage (from immediately prior to immediately after the takedown) is embedded for reference and can be viewed by clicking the image below (the video will play in the document).[82]

Takedown Video

Any reasonable officer would know and appreciate that the technique Ofc. Kirkman employed— a rear double leg takedown—is highly likely to result in the subject's uncontrolled fall. As a threshold matter, the fact that Mr. Ellis was handcuffed at the time is highly relevant because it bears directly on Mr. Ellis's ability to mitigate his fall.

The subject's physical and mental state are relevant considerations because takedowns generally depend on the subject compensating, to some extent, for the

---

[80] Readers are referred to the embedded video on this page.
[81] Bluffton Police Department, Officer Report for Incident 17BP28602, at 4, 6.
[82] Adobe Flash is required to view the video. It may be downloaded for installing from the following link: https://helpx.adobe.com/acrobat/11/using/flash-player-needed-acrobat-reader.html.

motion. An intoxicated subject who lacks the presence of mind to put their hand up when he is thrown close to the ground, for example, is far more likely to strike their head or face on the ground than is a sober subject. Similarly, a physically frail subject may be unable to break their fall or may be injured in the attempt to do so, and smaller subjects may be vulnerable to injuries that can result from officers intentionally falling on top of subjects during a takedown.[83]

With regard to this particular technique, it is obvious, and any reasonable officer would know, that lifting someone from below the knees while controlling the subject's hips (as Ofc. Kirkman did by pushing his right shoulder into Mr. Ellis while holding his legs) dramatically limits the subject's ability to control their fall; the subject can neither step forward to catch themselves (because their legs are being held and lifted back) nor attempt to align their hips to maintain their balance (because their legs are being pulled back while their hips are being held in place or pushed forward). Indeed, that is exactly why single and double takedowns are staples of wrestling and other martial arts. Further, any reasonable officer would know and appreciate that an officer who initiated such a maneuver simply is not going to be able to meaningfully control the subject's fall. Of course, an individual whose hands are secured in handcuffs behind their back is completely unable to brace or catch themselves as they fall forward, so the subject is not going to be able to meaningfully control their fall, either.

Any reasonable officer would also know and appreciate that putting a handcuffed individual into an uncontrolled forward fall is highly likely to result in the subject's face or head striking the ground. Such an impact is substantially likely to risk death or serious physical injury. It is common, for example, for police agencies to emphasize to officers the risks of striking a subject's head with empty hand tactics (e.g., punches or slaps).[84] This is true because

> under some circumstances strikes to the head or face can be reasonably expected to risk causing death or serious physical injury. There is a substantial likelihood, depending on the type of strike and where the strikes connect, that a strike will damage the eyes, nose, orbital bones, cheekbone, or jaw through blunt trauma; cause permanent scarring by, for example, tearing skin or damaging the outer ear; cause the head to twist beyond normal rotation in a way that injures the cervical spine or associated muscles; or cause an epidural hematoma (colloquially known as "swelling in the brain," this refers to bleeding in the space between the dura, which surrounds the brain, and the skull), which can carry a substantial risk of death. Further, should a strike to the face or head knock the subject to the ground, the impact of the subject's head against the ground may foreseeably cause

---

[83] SETH W. STOUGHTON ET AL., EVALUATING POLICE USES OF FORCE, 202 (forthcoming 2020)
[84] See, e.g., Omaha Police Department General Order 10-13 (defining the head generally as an "area[] of the body that when struck with an empty hand tactic . . . ha[s] a high risk of causing serious bodily injury").

substantial injury even if the strike itself did not. We are not aware of any legitimate police training that instructs officers to strike subjects in the head or face; indeed, police agencies commonly instruct officers to avoid such strikes unless the circumstances justify the application of deadly force.[85]

It is even more common for agencies to adopt policy or training that generally instructs officers to avoid striking subjects in the head with batons or other impact weapons except in deadly force situations.

In this case, Ofc. Kirkman did not use an empty hand strike or an impact weapon, but he did strike Mr. Ellis's head against the ground using a technique in which that result was highly likely, if not inevitable. Any reasonable officer would have known and appreciated that a rear double leg takedown, when performed on an individual whose hands are secured behind their back, carries a high risk of serious physical injury or death.

Finally, any reasonable officer would have known that the situation did not justify using any technique with a high risk of serious physical injury or death. As described above, officers learn about the constitutional framework under which seizures—including certain police uses of force—are evaluated: seizures must be "objectively reasonable." The "reasonableness test" was articulated in *Graham v. Conner*,[86] a case with which officers are well acquainted. In that case, the Court wrote, "[T]he question is whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."[87] In *Graham*, the Court held that the determination of whether a particular seizure was constitutionally reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."[88] That balancing test demands "careful attention to the facts and circumstances of each particular case." [89] The Court provided guidance as to which facts and circumstances are relevant to the objective reasonableness determination, identifying a non-exhaustive list of factors, commonly referred to as the *Graham* factors, that are particularly relevant to the reasonableness determination: 1) the severity of the crime; 2) whether the suspect poses an immediate threat to the safety of the officer or others; and 3) whether the suspect is actively resisting arrest or is attempting to evade arrest by flight.[90]

Applying that framework, no reasonable officer would have thought that the risks of using a rear double leg takedown on a handcuffed subject were justified under the circumstances. First,

---

[85] SETH W. STOUGHTON, EVALUATING POLICE USES OF FORCE, 201 (forthcoming 2020).
[86] 490 U.S. 386 (1989).
[87] *Graham v. Connor*, 490 U.S. 386, 397 (1989).
[88] *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted).
[89] *Graham v. Connor*, 490 U.S. 386, 396 (1989).
[90] *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Mr. Ellis was being arrested for driving on a suspended license, a low-level, non-violent offense. Even considering the potential for Mr. Ellis to be charged with resisting officer's efforts—a charge that could presumably apply in almost all circumstances in which officers use force—the severity of the crime(s) at issue are relatively low.

Second, at the time Ofc. Kirkman used force against him, Mr. Ellis was handcuffed, positioned immediately next to one officer (Ofc. Kirkman). and in the vicinity of two other officers (Ofc. Swinehammer and Ofc. Gibson). Indeed, in the moments leading up to the use of force, Mr. Ellis was facing a police vehicle with Ofc. Kirkman behind him. In such circumstances, there is no imminent threat, as that term is properly understood, to the safety of officers or others.

Third, Mr. Ellis was not attempting to evade arrest by flight, nor actively resisting the arrest itself, but may have been actively resisting Ofc. Kirkman's attempt to complete a search incident to arrest. As described above, there is some ambiguity in the available evidence on that point. Even assuming that Mr. Ellis was actively resisting Ofc. Kirkman's attempt to complete a search incident to arrest, however, the manner in which he did so was limited. At most, he sought to turn his body slightly (and, incidentally, toward where Ofc. Kirkman was reaching) or to push back when he was being held up against the police vehicle (a position from which he could not be fully searched incident to arrest anyway). That is, at the time Ofc. Kirkman used force, the situation was stabilized; Mr. Ellis was generally under Ofc. Kirkman's physical control, even if he was not cooperating with the search incident to arrest.

It is also important to note that there were a wide range of reasonable options that Ofc. Kirkman and the other officers could have used to complete the search incident to arrest, including taking Mr. Ellis to the ground in a more controlled manner. While a complete discussion of relevant alternatives is outside the scope of this report, it is worth noting that there are a range of more appropriate techniques that could have been employed to bring Mr. Ellis to the ground in a more controlled fashiong, including a single leg sweep (which could have allowed an officer to lower Mr. Ellis backward to the ground) or a modified body lock takedown (in which Ofc. Kirkman would have grabbed Mr. Ellis around the waist and lifted, using this position to maintain significantly more control over Mr. Ellis's descent then the rear double leg takedown permitted). The presence of three officers on scene opens up an even wider range of alternative measures. From the position where he was holding Mr. Ellis against the vehicle, Ofc. Kirkman could just as easily, and perhaps more easily, called for assistance and multiple officers could have guided Mr. Ellis to the ground in a more controlled manner. These options would have been readily apparent to any reasonable officer on the scene at the time.

In light of the foregoing, any reasonable officer would have known that performing a rear double leg takedown on a handcuffed subject was unreasonable, excessive, and contrary to generally accepted police practices.

## 2. Ofc. Kirkman's descriptions of certain events are inconsistent with the video evidence

The descriptions of several events provided in Ofc. Kirkman's report are inconsistent with the video evidence.

First, there is an inconsistency with regard to events immediately after Mr. Ellis was handcuffed. According to Ofc. Kirkman's report, he attempted to search Mr. Ellis whether Mr. Ellis resisting that attempt, immediately handcuffs were applied. Specifically, Ofc. Kirkman's report reflects that he "began to conduct a search of Ellis' person"[91] while Mr. Ellis was still next to his own vehicle. It indicates that when Ofc. Kirkman "began to check Ellis' [sic] pockets," Mr. Ellis "attempted to turn around in an effort to stop the search" and told Ofc. Kirkman to put him in the police vehicle.[92]

The video evidence appears to contradict Ofc. Kirkman's statement that he attempted to search Mr. Ellis at the time. The video from Ofc. Kirkman's and Ofc. Swinehammer's BWCs shows Ofc. Kirkman handcuffing Mr. Ellis and starting to double-lock Mr. Ellis's handcuffs. Mr. Ellis moved, and Ofc. Kirkland directed him to stop moving, but it was not while Ofc. Kirkman was attempting to conduct a search and thus could not have been "in an effort to stop the search."[93] The video suggests that Ofc. Kirkman does not appear to have attempted to start searching Mr. Ellis until relocating him to the rear of the police vehicle.

Second, there is an inconsistency with regard to how Ofc. Kirkman used force. According to Ofc. Kirkman's report, he "reached from Ellis' [sic] around the waist."[94] Ofc. Swinehammer's report,[95] Ofc. Gibson's report,[96] Master Patrolmen Dickson's report,[97] and the videos of the incident all reflect that Ofc. Kirkman grabbed Mr. Ellis below the knees. As described above, this is a meaningful difference because of the amount of control over Mr. Ellis's fall that a grab around the waist would have given Ofc. Kirkman compared to a grab at or below the knees.

---

This space intentionally left blank.

---

[91] Bluffton Police Department, Officer Report for Incident 17BP28602, at 4.
[92] Bluffton Police Department, Officer Report for Incident 17BP28602, at 4.
[93] Copy of Swinehammer.Arrest.avi at 0:05:01.
[94] Bluffton Police Department, Officer Report for Incident 17BP28602, at 4.
[95] Bluffton Police Department, Officer Report for Incident 17BP28602, at 6.
[96] Bluffton Police Department, Officer Report for Incident 17BP28602, at 7.
[97] Bluffton Police Department, Use of Force Report, at 2.

**Submission**

The preceding constitutes my preliminary report regarding the interaction between Bluffton Police Department officers and Ted Ellis. This preliminary report is based on the materials reviewed to date. I understand that additional materials are likely to be available in the future. Should any additional information cause me to expand, add, or revise any of my opinions, I reserve the right to revise, amend, or supplement this report accordingly.

Respectfully Submitted,

Seth Stoughton
April 1, 2020